STATE of Iowa, Appellee,

v.

Darrell Wayne FOWLER, Appellant.

No. 60879.

Supreme Court of Iowa.

July 26, 1978.

James M. Hood, Davenport, for appellant.

Richard C. Turner, Atty. Gen., J. Susan Carney, Asst. Atty. Gen., and Gary M. Lane, Asst. County Atty., for appellee.

Considered by MOORE, C. J., and RAWLINGS, LeGRAND, HARRIS, and McCORMICK, JJ.

HARRIS, Justice.

Following our reversal upon defendant's prior appeal he was retried and again convicted of second-degree murder and assault with intent to commit murder. From these convictions defendant once more appeals, challenging the jury instructions given by the trial court. We affirm.

The facts are not in serious dispute. They were recited in our opinion upon defendant's prior appeal. *State v. Fowler*, 248 N.W.2d 511, 513 (Iowa 1976). Darrell Wayne Fowler (defendant) was to return his three youngest children to their mother, defendant's former wife, Patricia, on November 17, 1974. After driving to her residence defendant sat with the children in the car for about five to ten minutes.

Patricia, accompanied by her boyfriend, Richard Kamps, came to the car from the house. Patricia went to the passenger side and Kamps the driver's side. Patricia opened the door and tried to pull one of the children from the car. Kamps and defendant began arguing. There is dispute as to whether or not Kamps came into physical contact with defendant. According to defendant Kamps attempted to pull defendant from the car by grabbing his legs.

At this point Kamps observed that defendant was armed. He shouted, "My God, he's got a gun," and began running. Defendant fired three shots all of which struck Kamps. Defendant then started after Patricia. A neighbor testified defendant stopped under a street light, raised his arm, and fired a shot at Patricia. At trial defendant testified his intention was only to scare Kamps and not to hit him. He testified he chased Patricia in order to discuss his visitation rights. According to defendant when he caught her he put his hand on her shoulder and she fell to the ground. He straddled the lower portion of her body and the gun discharged when he was trying to hold down her arms.

When the police arrived and approached Fowler he said, "I got mad and shot her." Patricia died as a result of the shooting. Kamps survived. Defendant was tried and convicted of second-degree murder for Pa-

tricia's death. On a separate count he was tried and convicted of assault with intent to commit murder for the shooting of Kamps.

Defendant's two assignments relate to his requested instructions on involuntary accidental homicide and the trial court's instruction on the provocation necessary to reduce second-degree murder to manslaughter.

I. Defendant's first complaint is directed to instructions given and the refusal of the court to give requested instructions on the subject of involuntary manslaughter. Defendant argues he made out a jury question on his claim the killing of Patricia was an accident. He believes he was improperly deprived by the instructions of an opportunity to have the jury fairly consider whether to acquit him of second-degree murder in favor of the included offense of *involuntary* manslaughter. The jury instructions given were in fact more complete for considering voluntary manslaughter than for involuntary manslaughter.

The distinction between the two types of manslaughter was explained in *State v. Boston,* 233 Iowa 1249, 1255, 11 N.W.2d 407, 410 (1943):

"Our statute, Code section 12919 [§ 690.-10, The Code, 1973], does not define manslaughter. The common law definition, the unlawful killing of another without malice express or implied, prevails in Iowa. It is commonly divided into voluntary and involuntary manslaughter. The former is committed in a sudden heat of passion due to adequate provocation. Involuntary manslaughter is an unintentional killing without malice in the doing of an unlawful act not amounting to a felony or of some lawful act in an unlawful manner. (Authorities)."

Our observation in *Boston* can be put in somewhat clearer perspective by contrasting it with the following:

"The trend of the case-law, where not hampered by statute, has been to include within 'voluntary manslaughter' certain unintentional killings,—that is, it includes all homicides whether intentional or unintentional which are committed with a man-endangering-state-of-mind and are not justified or excused but are perpetrated under circumstances of recognized mitigation. And since manslaughter itself is a 'catch-all' concept, including as a matter of common law all homicide not amounting to murder on the one hand and not legally justifiable or excusable on the other, the general outline of involuntary manslaughter is very simple. Every unintentional killing of a human being is involuntary manslaughter if it is neither murder nor voluntary manslaughter nor within the scope of some recognized justification or excuse.

"Part of the boundary line of this 'catch-all' concept having been dealt with in the consideration of malice aforethought and of voluntary manslaughter, it is necessary at this point to take up the factors which determine whether homicide is or is not excusable. Where loss of life has been neither intended nor the result of any other sort of man-endangering-state-of-mind, the killing will be excused if he who caused it was not engaged in any unlawful activity at the time and was free from negligence. Homicide is excusable, so far as the common law of crimes is concerned, in some cases in which the slayer was not as fully free from fault as indicated by such a statement. This requires separate attention to killings resulting from (a) negligence, and (b) an unlawful act." Perkins, On Criminal Law, pp. 71–72 (Second Ed. 1969).

We recently reviewed and explained the single standard of conduct to be applied in involuntary manslaughter cases. *State v. Kernes,* 262 N.W.2d 602, 604–606 (Iowa 1978).

In defendant's earlier appeal 248 N.W.2d at 518–520 we considered defendant's claim the trial court upon his first trial should have instructed that defendant was entitled to an acquittal if the jury found the shooting of Patricia was an accident. For the reasons there explained we rejected defendant's contention.

Defendant believes our decision in his earlier appeal does not control the instant assignment. In the earlier case we con-

sidered whether the fact of an accident should entitle him to an outright acquittal. By contrast the question defendant now seeks to raise is whether the fact (if it be a fact) the shooting of Patricia was an accident should reduce his guilt from second-degree murder to involuntary manslaughter. We agree our opinion in defendant's earlier appeal is not dispositive of the instant assignment.

The State contends defendant did not preserve error on this assignment because his requested instructions were themselves erroneous. Defendant counters this contention on the basis of our oft cited rule in *State v. Wilson,* 234 Iowa 60, 85, 11 N.W.2d 737, 749–750 (1943):

" * * * [E]ven though any of the instructions requested may have contained erroneous statements of law, if they were matters upon which the court should have instructed, but did not, the court committed error in not properly instructing upon them when thus called to its attention. This is the rule in civil cases, and, by stronger reason, it is, and should be, the rule in criminal cases. * * *."

■ This well settled rule has no application here. The purpose of the *Wilson* rule is to prevent an obvious injustice. The drafting of jury instructions is an exacting craft. A litigant should be allowed, whenever possible, to assert on appeal those errors he made known to the trial court. Under *Wilson* the error pointed out to the trial court by way of a requested instruction is preserved notwithstanding the existence of error in the requested instruction.

Many reasons support the rule. For example in drafting requested instructions trial counsel do not enjoy the advantage of improving them by way of entertaining exceptions. The central basis for the rule rests in addressing the needless injustice that would otherwise result. A technical drafting failure which does not mislead the trial court should not deny a litigant his right to appeal on the basis of the error he complained of. Under this view it becomes most important to understand exactly what was made known to the court in the requested instruction.

Defendant's requested instructions were as follows:

"Instruction # 1: You are instructed that it is the position of Darrell Fowler that the shooting of Patricia Fowler was an accident.

"Accidental death, to be excusable, must be caused in the doing of some lawful act.

"You are instructed that if an individual with a gun in his possession is acting with a disposition that shows a heart without regard for human life, and the gun accidentally discharges, he is not doing a lawful act, and is not entitled to an accident defense; but, if the individual with the gun is acting in a negligent manner and the gun accidentally discharges, then your verdict should be manslaughter.

"The State of Iowa has the burden to demonstrate beyond a reasonable doubt that the shooting was not an accident, and was unlawful.

"Instruction # 2: Involuntary manslaughter is defined as the unlawful killing of a human being without malice expressed or implied. If the act of killing is done on sudden impulse and is immediately executed without deliberation, premeditation, or malice, the crime is voluntary manslaughter.

"Instruction # 3: If you find the shooting was an accident, but are uncertain whether Darrell Fowler was acting with a disposition that shows a heart without regard to human life, or in a negligent manner with a gun, you must give Darrell Fowler the benefit of your doubt, and find him guilty of manslaughter."

Defendant's exceptions to the trial court instructions did nothing to expand the language of his requested instructions. He complained there was "no instruction on accident." In arguing for such an instruction defendant took the position Patricia's killing was not unlawful if accidental. Taken together, defendant's requested instructions and exceptions to the trial court's instructions were not sufficient to preserve

the theory he now seeks to present on appeal.

In order to explain why we think defendant's record was insufficient we must bear in mind the claims made during trial. First, defendant contended, at least in part, his shooting of Patricia was done in the heat of passion and due to adequate provocation by Kamps. See division II of this opinion. The jury was fully instructed on the subject of voluntary manslaughter.

Defendant then turned his argument to involuntary manslaughter. But, under *State v. Boston,* supra, there was no involuntary manslaughter unless defendant was either engaged in (1) an unlawful act not amounting to a felony, or (2) a lawful act done in an unlawful manner. The second possibility for involuntary manslaughter is not available to defendant because we rejected any suggestion defendant was engaged in any lawful act under the same facts in his first appeal. 248 N.W.2d at 520.

Accordingly defendant is driven to now claim his shooting of Patricia could have been involuntary manslaughter under the sole remaining definition: He is left with the possibility of claiming he killed Patricia while engaged in an unlawful act not amounting to a felony. The question then becomes whether defendant's trial record in this regard was sufficient to alert the trial court to the position he now wishes to assert on appeal.

■ Defendant now seeks to complain of the failure of the trial court's instructions to sufficiently inform the jury of the differing characteristics and effects of involuntary manslaughter as contrasted with voluntary manslaughter. At trial, in his requested instructions, and in his exceptions to the trial court's instructions, defendant sought to have the jury informed as to his theory regarding his claim the shooting was an accident. In his requested instructions 1 and 3 the thrust of defendant was one of negligence. In requested instruction 2 defendant did refer to involuntary manslaughter by name but the definition there offered was in no way inconsistent with the trial court's general definition of manslaughter.

We cannot find the trial court was alerted to any claim the shooting of Patricia occurred while defendant was doing an unlawful act not amounting to a felony, such as an assault or an assault and battery.

Defendant's record was insufficient to preserve error. His first assignment is without merit.

■ II. In his second assignment defendant complains of instructions given and refused on the provocation necessary to reduce second-degree murder to manslaughter. The trial court instructed the jury it was for them to determine whether a blow, if any, administered by Kamps was sufficient provocation to reduce the charge of assault with intent to commit murder to assault with intent to commit manslaughter. Defendant contends a similar instruction should have informed the jury to consider whether provocation of Kamps was sufficient to reduce the charge of second-degree murder of Patricia down to manslaughter.

The question is whether the provocation, to be effective to reduce the charge, must be caused by the slain person. We find no Iowa cases directly dealing with the question. However the rule seems to be " * * * the provocation must have been given by the person who was killed, except in those cases in which the wrong person was killed by accident or mistake, or deceased was present aiding and abetting the person causing the provocation." 40 C.J.S. Homicide § 53, p. 917. See also 40 Am. Jur.2d, Homicide, § 59, p. 352. We understand the exception for persons killed "by accident of mistake" to be cases of mistaken identity under the above definition. Patricia's death was not the result of mistaken identity.

It is unlikely the case falls under the other exception, where the deceased "was present aiding and abetting the person causing the provocation." Patricia was present at the time defendant now claims Kamps provoked him. But, even accepting defendant's version of the evidence, we find

no claim that Patricia aided or abetted Kamps in any attack on defendant.

In any event we reject defendant's second assignment on the basis of his own testimony. Defendant testified he had no desire or intention of killing Patricia. On cross-examination defendant testified in part as follows:

"LANE (the prosecutor): So generally you said, 'I got mad and then I shot Pat?'

"FOWLER: But it wasn't meant to be I was mad at Pat. For there was no reason for my being mad at Pat.

"LANE: You won't dispute, according to your own statement, at the time you shot Pat you were in a state of anger, weren't you?

"FOWLER: I was not angry to harm anyone. I can definitely tell you this."

It can be seen defendant's own testimony belies any claim any provocation by Kamps influenced his behavior toward Patricia. Defendant was not entitled to the instruction he sought because there was no evidence to support submission of such a theory to the jury. Defendant's contention to the contrary is without merit.

AFFIRMED.